## LEPOFSKY v CITY OF LINCOLN PARK

1. COURTS—SUPERINTENDING CONTROL—ADMINISTRATIVE APPEAL.

> An order of superintending control will be granted only if there is an inadequate remedy at law; therefore, an order will not be granted to plaintiffs where the trial record does not make it clear what type of hearing, if any, was held by a city council in regard to plaintiffs' application for a new license for the sale of used auto parts, since an administrative appeal could be taken (GCR 1963, 711.2).

2. CERTIORARI—SUPERINTENDING CONTROL—SCOPE OF REVIEW.

> The traditional limits on scope of review under the writs of certiorari, prohibition and mandamus are observed under the new order of superintending control; therefore in an action characterized as one in certiorari, the trial judge's review must of necessity be limited to questions of law, and in examining the evidence the trial court does so only to justify the finding in the inferior tribunal below as a legitimate inference from the facts proven, regardless of the court's own conclusion as to the appropriateness of the inference.

3. CERTIORARI—COURTS—SCOPE OF REVIEW.

> A court may review only tribunals of a judicial or quasi-judicial nature on certiorari.

4. MANDAMUS—PUBLIC OFFICER—NONMINISTERIAL DUTY.

> An action for mandamus will not lie to compel a public officer to perform a nonministerial duty dependent on disputed and doubtful facts (GCR 1963, 714).

5. MANDAMUS—ADMINISTRATIVE RECORD—REVIEW.

> An action for mandamus cannot properly lie if there was no administrative record, or no review of the record if there was one, to discover legal, as opposed to factual, errors.

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur 2d, Courts §§ 116, 117.
[2, 3] 14 Am Jur 2d, Certiorari §§ 63–67.
[4] 52 Am Jur 2d, Mandamus § 80.
[5] 52 Am Jur 2d, Mandamus §§ 201–206.

Appeal from Wayne, Nathan J. Kaufman, J.
Submitted Division 1 February 13, 1973, at De-
troit. (Docket No. 13382.) Decided July 23, 1973.

Complaint by Fred, Bessie, Theodore, and Sidney
Lepofsky, doing business as Liberty Auto Wreck-
ing, against the City of Lincoln Park, its mayor,
councilmen, and chief of police, seeking a writ of
mandamus compelling the issuance of a license for
the sale of used auto parts at two locations. Judg-
ment for plaintiffs as to one location. Plaintiffs
appeal. Defendants cross appeal. Reversed and
remanded with instructions.

*Edward Grebs,* for plaintiffs.

*Robert E. Butcher,* for defendants.

Before: V. J. BRENNAN, P. J., and HOLBROOK and
VAN VALKENBURG,* JJ.

HOLBROOK, J. In May 1966 an application for a
new license for the sale of used auto parts for the
year beginning July 1, 1966, was filed in the name
of Liberty Auto Wrecking by Fred and Bessie
Lepofsky for two separate premises—1007 and
1059 Fort Street in the City of Lincoln Park. All
licenses under the city ordinance[1] are issued annu-

---

* Former circuit judge, sitting on the Court of Appeals by assign-
ment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] City Ordinance Used Automobile Parts, Article XVIII
"LICENSE REQUIRED TO CONDUCT USED AUTOMOBILE
PARTS BUSINESS.
"8-18.1. No person, firm, co-partnership, or corporation shall oper-
ate or cause to be operated within the City of Lincoln Park any
business commonly known as the Used Auto Parts Business, *dealing*
in used, or second-hand auto parts or salvaged automobiles *without
first obtaining a license* therefor from the Mayor of the City of
Lincoln Park and complying with the terms of this Article.
"DEFINITIONS AND GRANTING OF LICENSES.
"8-18.2. For the purpose of this Article a dealer in used auto parts
shall be *defined to mean any person, firm, co-partnership or corpora-*

ally and expire each June 30. Plaintiffs Fred and Bessie Lepofsky have been licensed to operate a

*tion* engaged or conducting a business commonly known as the Used Auto Parts Business, or in the business of dismantling automobiles, or in dealing in used or second-hand auto parts or salvaged automobiles, or in the business of selling, buying, or delivering used or second-hand auto parts in the City of Lincoln Park. The Mayor and Council is hereby authorized to grant licenses for the purpose aforesaid to any citizen of the United States of the age of 21 years and upwards and of good character, or *to any firm, co-partnership* or corporation organized or doing business in accordance with the laws of the State of Michigan. Said license may be granted by the Mayor and Council upon the applicant paying into the city treasury the sum of $25 and executing a bond in the penal sum of $2,500 with one or more sureties, conditioned that said person, firm, co-partnership or corporation shall faithfully observe the conditions of this Article.

"EXPIRATION OF LICENSES.

"8-18.3. All licenses granted under the terms of this ordinance *shall expire* on June 30th of each year.

"EXHIBITION OF RECORDS OF PURCHASE.

"8.18.4. Every licensee shall on demand exhibit all automobiles or parts thereof bought or received and give the name, residence, and description of all persons from whom same was purchased or received to the Mayor or the officers of the Police Department.

"KEEPING OF RECORDS OF PURCHASE AND DELIVERY OF LICENSE PLATES.

"8-18.5. He shall keep a record or book written in ink in the English language, containing the names, residence, and description of all persons from whom purchases were made. He shall promptly deliver to the Police Department all automobile licenses attached to any machines received by him which are to be dismantled.

"SUSPENSION AND REVOCATION OF LICENSES.

"8-18.6. The Mayor *may at any time* suspend or revoke any license granted under this ordinance and order the place of business of the licensee closed for *any infraction of this ordinance* or other violation of the law. *All licenses granted hereunder are issued and accepted with the understanding that they are subject to suspension or revocation at the will of the Mayor.* In case of any suspension or revocation the Mayor or Commissioner of Police shall cause to be served upon the licensee or person in charge of the business a notice in writing of such action by the Mayor. No person shall continue operating such business after service upon him of notice of such suspension or revocation. Before any license granted under this ordinance is revoked by the Mayor, charges in writing shall be preferred against the licensee, and a copy of such charges shall be served upon such licensee and he shall be given a hearing before the Mayor with a reasonable opportunity to present his defense.

"REQUIREMENTS FOR PETITIONING FOR CONDUCTING USED AUTOMOBILE PARTS, DEALER'S LICENSE.

"8-18.7. *No building, place, or lot shall be used for the purpose of*

used auto parts business in Lincoln Park since 1933 or 1934 when the property at 1007 Fort Street was sold to them. The same business had been in existence for about ten years prior to their purchase of it. In the original complaint in this action filed on June 29, 1966, Fred and Bessie Lepofsky as the only named plaintiffs requested an order compelling the city to issue the license. Defendants filed an answer wherein they claimed that final action had not yet been taken on the license, the mayor and city council having considered the license application June 27, but the hearing being adjourned until July 5, for the alleged reason that the premises violated the city fire code because certain combustibles were stored there. Earlier, on December 6, 1965, the mayor and city council had passed a resolution that the property at 1007 Fort Street constituted a nuisance because of the disrepair of the board fence surrounding the premises. The owners were given 30 days to abate the nuisance. Thereupon, Sidney Lepofsky, son of Fred and Bessie, applied to the city building in-

*operating* a used car establishment unless a petition as hereinafter set forth shall therefore be filed with the Council for at least 10 days. *Where the used parts establishment is conducted and maintained in a wholly enclosed structure, such petition shall be signed by 51% of the persons owning property within a radius of 250 feet of the premises consenting to such use. Where the used parts establishment is conducted and maintained in whole or in part in any vacant lot or partially exposed structure, then such petition shall be signed by 51% of the persons owning property within a radius of 500 feet of the premises consenting to such use.*

* * *

"ENCLOSURE OF PREMISES.

"8-18.10. In the event the premises used for the maintenance of such business is exposed to the adjacent street, alley, or property, the Mayor *shall as a condition precedent at the issuance* of such license, require the applicant of licensee to inclose said premises by a properly painted, tight board fence at least 8 feet high, erected in such a manner as to obliterate the premises from view, and which fence *shall be properly maintained at all times by the licensee."* (Emphasis supplied.)

spector for a permit to fix the fence, which was denied. Sidney and his brother Theodore Lepofsky then went ahead and collected wood and began repairing the fence despite the lack of a permit. The collected wood was stored at 1059 Fort Street until Sidney and Theodore received a notice on or about June 8, 1966, from the fire marshal declaring the collection of wood to be a fire hazard and ordering it removed. This fire hazard was apparently the reason for the city council's adjournment of the June hearing, at least as to the license application for 1059 Fort Street. Subsequently, the wood was moved to 1007 Fort Street. In the meantime, while the repairing of the fence at 1007 Fort Street continued without a permit, Sidney and Theodore Lepofsky were served with a summons June 9, 1966, for erecting a fence without a permit. Sidney and Theodore were thereafter tried and convicted in Lincoln Park Municipal Court as charged, but appealed to the Wayne County Circuit Court, where they were found not guilty November 10, 1966, of violating the ordinance, the grounds apparently being that they were repairing, not erecting, a fence. Apparently the fence has now been fully repaired.

While Sidney and Theodore Lepofsky were contemplating the summons for the fence erection violation, they received another summons, on June 27, 1966, this one charging that they were engaged in the operation of a junk business at 1007 Fort Street without a license. The pertinent part of the junk dealers ordinance here is set out in the footnotes.[2] As a result of this latest summons,

---

[2] City Ordinance Junk Dealers, Article IX

"PERMISSION REQUIRED TO ENGAGE IN JUNK BUSINESS

"8-9.12. No building, place, or lot for junk, rags, old rope, paper, bagging, old iron, brass, copper, tin, bottles, salvage parts of old automobiles, old lumber, house wrecking material, slush or lead, or

plaintiffs Fred and Bessie Lepofsky filed this suit June 29, 1966, seeking a writ of mandamus compelling the city to issue used auto parts licenses for both 1007 and 1059 Fort Street, and seeking an injunction against further action by the city against their business. An order to show cause for a temporary injunction against the city was obtained, same to be heard on July 15, but this hearing was adjourned until August 16, 1966. In the interim, on August 1 the city council denied plaintiffs Fred and Bessie Lepofsky's application for a license filed in May 1966 for the following reasons:

"(a) The fence surrounding the premises does not comply with the requirements of the licensing ordinance and constitutes a public and private nuisance;

"(b) The applicants for license are apparently not the operators thereof and have apparently leased the premises to another person or persons, who is or are unlicensed to conduct any business on the premises;

"(c) The premises are being used for purposes—*i.e.* junkyard operation—not contemplated or permitted by the license previously held by the applicants or sought in the pending application or permitted by the pertinent city ordinances."

On August 4, 1966, Sidney and Theodore Lepofsky were convicted in municipal court of operating a junk business without a license. The municipal

---

any like articles, shall hereinafter be established within the territory of the City of Lincoln Park, unless the owner, operator or person in control, *shall, prior to such establishment, secure permission to establish the same by resolution of the Council and in no event shall any such building, place, or lot be established within the territory within the City of Lincoln Park where 65% or more of the property owners, within a radius of one city block of such premises, object in writing to the establishment of the same. No junk, as herein referred to, shall be stored or kept on any open lot or space, unless the licensee, or someone in his or its behalf, erects a tight board fence 8 feet high surrounding the same, which fence shall be painted and kept properly maintained.*"(Emphasis supplied.)

court ignored a defense that Sidney and Theodore were not the real owners and therefore improper defendants, since the ordinance requires the "person in control" to obtain a license. Lincoln Park Ordinances Ch IX, § 8-9.12, *supra,* footnote 2. This conviction was appealed and reversed in Wayne County Circuit Court June 3, 1968.

Meanwhile, back with Fred and Bessie Lepofsky's action against the city, a hearing was held August 16, 1966, on a contempt proceeding brought by the above-named plaintiffs against the City of Lincoln Park for alleged harassment, and on defendant city's motion for a summary judgment on the original action. During counsel's argument it appeared that the pleadings were not in order, and permission was given to add as parties plaintiff Sidney and Theodore Lepofsky, and to the city to file an amended answer. On October 16, 1966, an order was granted allowing such amendments, but at the same time the court ordered that plaintiffs post a $2500 bond in accordance with the city's license application requirements, that a building permit be issued for the construction of the new fence around 1007 Fort Street, and that a license be issued to operate the used auto parts business. Since this was exactly the relief sought by plaintiffs and since it was granted before the defendant could file an amended answer and without a hearing on the issues framed by the amended pleadings, we reversed on appeal and remanded. *Lepofsky v Lincoln Park,* 9 Mich App 501; 157 NW2d 463 (1968).

The case having been remanded, plaintiffs Fred, Bessie, Theodore and Sidney Lepofsky, doing business as Liberty Auto Wrecking, filed a supplemental complaint in October 1968. (Every May since 1966 plaintiffs have applied for a new license, but

the mayor and council have not acted on the
petition pending this litigation, though the bonds
and fees have been kept by the city.) A trial was
had without a jury, and the judge below decided[3]
that a used auto parts license should be issued for
1059 Fort Street; but since he found that the
premises at 1007 Fort Street were being used as a
junk yard without the appropriate license in viola-
tion of the city ordinance, he ordered plaintiffs to
terminate their business at that address. There is
no disagreement now over the order of the court
concerning 1059 Fort Street, and the appeal is
brought by plaintiffs in objection to the findings
and order of the trial judge concerning 1007 Fort
Street. Defendants file a cross appeal more to
substantiate the rulings below than to object to
any of them.

Plaintiffs first claim that the mayor and com-
mon council arbitrarily denied plaintiffs a new
license for their used auto parts business at 1007
Fort Street. Their primary objection here concerns
the events in the summer of 1966 when the coun-
cil considered the May 1966 application for a new
license for both 1059 and 1007 Fort Street. Plain-
tiffs claim that no notice in writing of any charges
were served upon them prior to the council meet-
ing and announcement of license denial on August
1, 1966, in violation of Lincoln Park Ordinances,
Ch XVIII, § 8-18.6.[4] They also alleged that they
were denied a hearing on the merits of the issues
involved, contravening the rule of *Detroit v Mash-*

---

[3] The trial judge made himself a witness by visiting the premises at
1007 and 1059 Fort Street unaccompanied by counsel from either
side. He then proceeded at trial to relate what he had seen on his
visits, and based his judgment thereon. We are surprised that neither
counsel objected to the judge's activities. *Valentine v Malone,* 269
Mich 619; 257 NW 900 (1934). Be that as it may, no objection was
made by either counsel on appeal, so there was no error.

[4] Set out in footnote 1.

*lakjian,* 15 Mich App 236; 166 NW2d 493 (1968), wherein the Court held that a licensing authority could not refuse, revoke or suspend an occupational license without informing the applicant or licensee of the reasons for the refusal and giving him an opportunity to be heard. We note that the United States Supreme Court has held that a hearing does not satisfy the mandates of procedural due process where an applicant is not informed of the reasons for his proposed rejection and is not afforded an adequate opportunity to rebut those reasons. *Willner v Committee on Character & Fitness,* 373 US 96; 83 S Ct 1175; 10 L Ed 2d 224 (1963). Defendants counter that a hearing was held on the merits of the issues surrounding the license application in the summer of 1966 prior to the August 1 announcement that the licenses would be denied.[5] It appears to us that the trial record does not make it clear what type hearing, if any, was held by the council, though there was evidence that one of the plaintiffs attended a city council meeting on June 27, 1966, at which time plaintiffs' license application was tabled temporarily.

Plaintiffs in their complaint seek an order granting them a license, an injunction preventing further harassment of their business by the city, and "further relief as shall be agreeable to equity and good conscience". On the other hand, the defense counsel characterized the action as being one under "the old writ of certiorari", while the trial judge characterized the action as "certiorari, to

---

[5] Defense counsel's statements at the trial seem to be of the opposite effect. In objecting to the introduction to the testimony of Sidney Lepofsky as to the city council's activities concerning 1007 Fort Street, he stated: "I object to that question, your Honor. The city council is the one that passed on these things, and if there's an official record, let him introduce it." The court agreed and sustained the objection.

review the actions of the city council, the mayor, and the officials there; mandamus, in the nature of ordering the same officials to issue the license to the plaintiffs". Certiorari is a writ issued by a superior to an inferior tribunal whose function is to bring before the superior tribunal the record of the proceedings below in order that the superior court may determine from the face of the record whether the inferior tribunal has exceeded its jurisdiction, or has made errors in the law. *Lenz v Mayor of Detroit,* 338 Mich 383; 61 NW2d 587 (1953). GCR 1963, 711.3 replaces the writs of certiorari, prohibition and mandamus to an inferior tribunal with an order of superintending control. An order of superintending control will only be granted if there is an inadequate remedy at law, which was not demonstrated here, since an administrative appeal could be taken. GCR 1963, 711.2. Moreover, previous appellate court opinions have affirmed the principle that the traditional limits on scope of review under the writs will be observed under the new order. *Drouillard v Roseville,* 9 Mich App 239; 156 NW2d 628 (1967); *Scallen v State Health Commissioner,* 376 Mich 64; 135 NW2d 426 (1965). Therefore, characterizing this action as one in certiorari, the trial judge's review must of necessity be limited to questions of law; in examining the evidence the trial court does so only to justify the finding in the inferior tribunal below as a legitimate inference from the facts proven, irregardless of the court's own conclusion as to the appropriateness of the inference. *Scallen, supra,* at pp 71–72. Moreover, under certiorari, a court may only review tribunals of a judicial or quasi-judicial nature. *Lenz, supra; Dyson v Detroit,* 333 Mich 116; 52 NW2d 623 (1952); *Parshay v Marquette Prison Warden,* 30 Mich App 556; 186 NW2d 859

(1971). While we might conceivably find the city council's denial of a new license to plaintiffs a quasi-judicial action, *see, e.g., Scally v Liquor Control Commission,* 320 Mich 188; 30 NW2d 831 (1948), we cannot ignore the *Scallen* holding that the office of certiorari, now subsumed under an order for superintending control, is limited to review of questions of *law.* Here the trial court did more than examine the evidence on the record of the city council's proceedings. This was a full-blown trial of the issues, with numerous witnesses, exhibits and arguments. Never, apparently, did the trial court review the administrative record, if there was any, before it. Indeed, plaintiffs contended there was no hearing held by the city council concerning their license application, thus allegedly denying them the rights of procedural redress reserved for them in Lincoln Park Ordinances, Ch XVIII, § 8-18.6,[6] and as a matter of constitutional law. *Detroit v Mashlakjian, supra; Willner, supra.* If there was no administrative record, and the trial record reveals none, save for the city council's announcement August 1, 1966, that it was denying the plaintiffs' license application, then the court below improvidently granted what it called *"certiorari",* since the court could hardly review evidence contained in the administrative record if there was no such record. *Puritan-Greenfield Assn v Leo,* 7 Mich App 659; 153 NW2d 162 (1967), citing Const 1963, art 6, § 28. If the action is characterized as one for certiorari, then, it must of necessity fail, unless an administrative record was presented for review, and that record alone was reviewed.

If this action is characterized as one for manda-

---

[6] Set out in footnote 1.

mus to a public official,[7] we again face similar problems with the scope of review permissible, but this time under GCR 1963, 714. While mandamus is a discretionary writ, it will not lie to compel a public officer to perform a nonministerial duty dependent on disputed and doubtful facts. *Lobaido v Detroit Police Commr,* 15 Mich App 138; 166 NW2d 515 (1968); *Calida Corp v Trenton Engineer,* 7 Mich App 496; 152 NW2d 38 (1967); *Taylor v Ottawa Circuit Judge,* 343 Mich 440; 72 NW2d 146 (1955); *Livonia Drive-In Theatre v Livonia,* 363 Mich 438; 109 NW2d 837 (1961). As is obvious under the Lincoln Park used auto parts licensing ordinance, the grant of a new license in this case is not merely ministerial, but demands an exercise of judgment and discretion on the part of the mayor and city council. Lincoln Park Ordinances, Ch XVIII, § 8-18.6.[8] Therefore, mandamus could not have properly been granted by the trial court here unless there was a clear abuse of discretion on legal grounds, as evidenced by the record of the administrative proceedings. *Coleman v State Highway Commissioner,* 311 Mich 690; 19 NW2d 461 (1945). See footnote 7. If there was no administrative record, or no review of the record if there was one, to discover legal, as opposed to factual, errors, then mandamus could not properly lie.

[7] Plaintiff could have sought mandamus relief in the alternative under either GCR 1963, 711.3 or 714, as so authorized under GCR 1963, 710.4. Had this action simply been characterized as one for mandamus to an inferior tribunal, *i.e.,* for superintending control, under GCR 1963, 711.3, such a characterization would give plaintiff the same hurdles to leap as in *certiorari:* (1) proving the city council acting in a quasi-judicial capacity in order to allow review; *Scally v Liquor Control Commission* and *Lenz v Mayor of Detroit, supra,* in text; (2) limiting his arguments to questions of law, not fact. *Mt Pleasant v Michigan Public Service Com,* 342 Mich 310; 69 NW2d 837 (1955); *Coleman v State Highway Commissioner,* 311 Mich 690; 19 NW2d 461 (1945).

[8] Set out in footnote 1.

We are confronted, then, with a situation where review of the Lincoln Park city council's action by the court below was improvidently granted if there was no administrative record, and improperly made if there was one. We have reviewed all courses of action open to us and have simply been unable to discover a means by which we might avoid remand of these proceedings to determine the adequacy of the administrative record. We are not unmindful of the strong possibility that there was no administrative record made, save for the August 1, 1966, announcement that plaintiffs would be denied a used auto parts license, and that therefore the circuit court would need remand the case back to the city council in order that a proper record be made. Such a result might seem wasteful at best, since the history of this prolonged litigation may obviate the fact that the Lincoln Park city fathers are insistent that plaintiffs' business at 1007 Fort Street cease operations. Moreover, we are distressed by the fact that many important issues presented to us by this case on appeal merit extensive analysis and discussion, which because of our required disposition of this case, we may not confront and answer. However, these factors, important though they are, do not dispel our obligation to refrain from interference with the acts of public administrators when performed within the scope of their authority. *Washington Agency v Insurance Commissioner,* 309 Mich 683; 16 NW2d 121 (1944). This obligation, of course, extends to the inferior courts over which we have superintending control. The judiciary's jurisdiction extends only so far as to allow review of administrative acts that are without the bounds of legal authority. This principle is mandated by the very character of our governmental system

and its reliance on the precept of separation of powers to assure the system's democratic operation. Const 1963, art 3, § 2. To willingly allow the lower court to improperly review the administrative proceedings of the Lincoln Park city council would be to abdicate our jurisdictional responsibility, even though in sustaining the strict jurisdictional limits of judicial authority here we may also be delaying the final adjudication of a controversy that is long overdue. The latter consequence is unfortunately unavoidable. It does serve, however, to once again stress to all courts the often illusive point that judicial review of administrative proceedings has strict, immutable boundaries which judges may not constitutionally cross without trespassing into territory supervised by legislative bodies.

Reversed and remanded for proceedings consistent with this opinion.

All concurred.