GARNER v MICHIGAN STATE UNIVERSITY

Docket No. 116980. Submitted April 3, 1990, at Lansing. Decided October 15, 1990. Leave to appeal applied for.

David Garner brought a wrongful discharge action in the Ingham Circuit Court against Michigan State University and its Board of Trustees, the College of Human Medicine and Department of Psychiatry. Plaintiff filed a complaint for mandamus and other relief. After a show cause hearing, the trial court, Lawrence M. Glazer, J., found that plaintiff had been granted tenure status by the university and that the Board of Trustees' policy on dismissal of tenured faculty for cause governed the dispute. The court issued a writ of mandamus ordering defendants to return plaintiff to his employment and the employment to continue until such time as action is taken pursuant to the university's policy on dismissal of tenured faculty for cause. Defendants appealed by leave granted.

The Court of Appeals *held:*

1. Plaintiff had constitutional property rights which could only be terminated by procedures that met due process. Defendants' reliance on the rescission doctrine is a "retrospective fiction" that cannot be interposed to justify a deprivation of property without due process. Plaintiff had a clear right to be returned to his employment and to be terminated only in conformity with defendants' policy on dismissal of tenured faculty for cause.

2. Plaintiff was denied, without due process, his property right to continued employment because he received no posttermination hearing.

3. The writ of mandamus was properly issued.

4. The use of mandamus to enforce a property right was appropriate. Alternate legal remedies available to plaintiff would not have been truly adequate.

5. Defendants' claim that the courts should defer, on public

REFERENCES

Am Jur 2d, Mandamus §§ 4, 64, 69, 248.

Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member. 66 ALR3d 1018.

policy grounds, to those responsible for academic administration was denied.

Affirmed.

1. MANDAMUS — DUTY — LEGAL REMEDIES.

A plaintiff must have a clear legal right to the performance of the specific duty sought to be compelled and the defendants must have a clear legal duty to perform the same in order for the plaintiff to obtain a writ of mandamus; in addition, the plaintiff must be without an adequate legal remedy.

2. MANDAMUS — APPEAL.

A trial court's decision to grant a writ of mandamus will not be reversed absent an abuse of discretion, nor will the trial court's findings of fact underlying the granting of the writ be disturbed unless they are clearly erroneous.

3. MASTER AND SERVANT — PUBLIC EMPLOYEES — DUE PROCESS.

A public employee, including a tenured professor employed by a public university, enjoys a property right in continued employment which the state may only take away in accordance with due process.

4. MASTER AND SERVANT — PUBLIC EMPLOYEES — DUE PROCESS.

A posttermination hearing may be required in order to afford a tenured public employee due process where, prior to his termination, the employee was entitled to no more than oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

5. MANDAMUS — DISPUTED FACTS.

A writ of mandamus may not be issued when based on disputed facts; the writ may be issued when some facts are in dispute where the only facts relevant to the determination whether the writ should be issued are undisputed.

6. MANDAMUS — CONTRACTS — PROPERTY.

Where a right or duty sought to be enforced rests wholly on contract, mandamus cannot issue to enforce it, because legal and equitable remedies afford relief; mandamus may lie, under appropriate circumstances, to enforce a property right.

7. ACTIONS — CONSTITUTIONAL RIGHTS — REMEDIES.

The temporary loss of a constitutional right constitutes irreparable harm which cannot be adequately remedied by an action at law.

*White, Beekman, Przybylowicz, Schneider & Baird, P.C.* (by *Arthur R. Przybylowicz*), for plaintiff.

*Office of the General Counsel, Michigan State University* (by *Michael J. Kiley* and *Kurt E. Krause*), for defendants.

Before: WAHLS, P.J., and MARILYN KELLY and G. S. ALLEN,* JJ.

G. S. ALLEN, J. In this suit for wrongful discharge, we are asked to decide the propriety of a writ of mandamus issued April 24, 1989, by the Ingham Circuit Court, ordering defendants to reinstate plaintiff, although not to "any particular position," and further ordering defendants not to dismiss plaintiff without a hearing as mandated by defendant university's policy on the dismissal of tenured faculty for cause. We find the writ properly issued and, therefore, affirm.

Plaintiff is a psychologist and renowned expert in the field of "eating disorders," primarily anorexia and bulimia. From early 1978 until December, 1987, he was employed by the University of Toronto, first as a lecturer and later as a full professor. In November, 1987, plaintiff's certification to practice clinically was suspended for two years for professional misconduct involving sexual contact with one of his former patients at the University of Toronto. He was subsequently asked to resign from the university and he did so in December, 1987.

In early 1988, Lionel Rosen, M.D., a professor of psychiatry at the Michigan State University College of Human Medicine, contacted plaintiff re-

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

garding possible appointment to the university. Rosen advised plaintiff to write W. Donald Weston, Dean of the College of Human Medicine, and explain the circumstances regarding his suspension from clinical practice and his resignation from the University of Toronto. Plaintiff did so by letter February 28, 1988.

In April and May of 1988 plaintiff was interviewed by Weston and Donald Williams, chairman of the university's Department of Psychiatry, and on June 21, 1988, was offered a tenured position as a professor of psychiatry in the Colleges of Human and Osteopathic Medicine at a beginning annual salary of $56,000. At a meeting of the university's Board of Trustees on July 30, 1988, the board approved plaintiff's appointment as professor "with Tenure, effective September 1, 1988."

On January 16, 1989, plaintiff informed Weston and Williams that a new charge of sexual misconduct had been filed against him in Ontario. On January 20, 1989, Weston wrote Provost David Scott recommending that plaintiff's employment with Michigan State University be terminated. The letter stated in pertinent part:

> In preemployment discussions with both me and Dr. Williams, the focus was on Dr. Garner's professional and ethical fitness.
>
>        * * *
>
> Dr. Williams and I each inquired of Dr. Garner regarding the possibility of other outstanding complaints of sexual inpropriety [sic]. He denied the same and steadfastly maintained that the complaint which led to his resignation from the University of Toronto and the professional discipline meted out by the OBEP [Ontario Board of Examiners in Psychology] was an isolated instance and that his gorss [sic] misjudgment was an aberration in an otherwise unblemished career as a psycholo-

gist. Dr. Williams specifically asked Dr. Garner whether he had ever had sexual relations with any other of his patients and Dr. Garner was unequivocal in his denial. He was clear in this point, the only point of concern that really mattered in our evaluation as to the viability of his candidacy.

* * *

On Monday, January 16, 1989, Dr. Garner advised me that the OBEP had, on December 29, 1988, notified him of a new hearing of a charge of professional misconduct relating to an alleged sexual relationship with another of his former patients. He did not deny the charges. Dr. Garner further stated that he had intimate relations with a number of other former patients over the years.

On the same date Williams wrote to Weston recommending plaintiff's dismissal. In the letter, Williams stated that he telephoned plaintiff on the evening of January 16, inquiring about the new allegation of sexual misconduct, and that plaintiff admitted to him that the new allegations were true. The letter continued as follows:

I then reminded him that during his preemployment interviews I had asked him if he had had any other instances of sexual contact with his patients and he told me no. Dr. Garner then said that he thought I was asking if he had any other charges of sexual misconduct pending. I then asked him again whether he has had additional sexual contact with his patients. Dr. Garner then told me he had had sexual contact with a patient in 1983 and numerous sexual contact [sic] with patients in the 1970's. Many of these contacts in the 1970's occurred 3-6 months after he had terminated treatment. I then asked him if I was to conclude that he had engaged in sexual relations with most of his patients or former patients he treated in the 1970's. Dr. Garner replied my conclusion was correct.

I then asked him why he had not told me these facts when I had, in fact, asked him about his sexual contact last Spring. Dr. Garner replied, "I was afraid I wouldn't get the job." I replied, "You're right—you wouldn't have."

Provost Scott requested that plaintiff attend a meeting on January 26, 1989, to discuss the letters which he had received regarding the new allegations of sexual misconduct. Present at the meeting were plaintiff, his attorney, Provost Scott and two members of the university's general counsel. Neither Weston nor Williams attended the meeting. According to plaintiff, the meeting consisted of plaintiff's being asked a series of questions which he answered to the best of his ability. He may have been asked for his side of the story. At no time, however, was plaintiff given the opportunity to confront his accusers, to cross-examine them, or to call witnesses in his own defense.

After reviewing plaintiff's remarks made during the January 26, 1989, meeting, conferring with Weston and Williams, consulting with the university's counsel, and meeting with the university's Board of Trustees,[1] Provost Scott, under authorization from the board, rescinded plaintiff's employment contract on February 6, 1989.

It is undisputed that the university established a policy, approved by the Board of Trustees on June 24, 1977, entitled "Dismissal of Tenured Faculty for Cause." The policy provides for full adversarial proceedings before termination, which the univer-

---

[1] On February 3, 1989, defendant Board of Trustees met in closed session and issued minutes which stated in part:

The Board heard from the Provost with regard to the matters contained in the memorandum, considered the advice of counsel and the course of action recommended by the Provost which was concurred in by the President and upon unanimous vote authorized the Provost to proceed with the rescission of Dr. Garner's contract.

sity in the instant case did not provide. Instead, the university chose to rescind plaintiff's contract.

When plaintiff's attempts to have the dispute resolved by the university's Committee on Faculty Tenure were rejected,[2] plaintiff filed a complaint for mandamus and other relief in the Ingham Circuit Court on March 21, 1989. At a show cause hearing held April 17, 1989, plaintiff testified that at no time was he given an opportunity to cross-examine his accusers or call witnesses on his own behalf. He also testified that, if granted a hearing, he would deny that he lied in his preemployment interviews or made any misrepresentations during the initial interviews. Finally, plaintiff testified that, if granted a hearing, he would contest the allegation of Williams that, in a telephone conversation with Williams on January 16, 1989, plaintiff admitted to sexual misconduct with numerous former patients.

At the conclusion of the show cause hearing, the trial court found that plaintiff was granted tenure status by the university and that the Board of Trustees' policy on dismissal of tenured faculty for cause governed the dispute. Accordingly, the court issued a writ of mandamus ordering defendants to return plaintiff to his employment and the employment to continue until such time as action is taken pursuant to the university's policy on dismissal of tenured faculty for cause. By order dated June 16, 1989, this Court granted defendants' application for leave to appeal but denied stay of the trial court's order.

[2] Plaintiff contacted the Faculty Grievance Officer, who advised that the appropriate grievance channel was the University Committee on Faculty Tenure. Plaintiff and the grievance officer filed written requests to the Chair of the Faculty Tenure Committee to hear plaintiff's case. By letter dated March 16, 1989, plaintiff and the grievance officer were advised the committee declined to hear the case on grounds the matter was best left for the courts to decide.

On appeal, defendants raise four issues which we have reformulated as five issues, hereinafter addressed.

### I

#### WERE DEFENDANTS RELIEVED OF THEIR DUTY TO AFFORD PLAINTIFF DUE PROCESS BECAUSE PLAINTIFF ALLEGEDLY LIED IN HIS PREEMPLOYMENT INTERVIEW, THEREBY AFFORDING DEFENDANTS THE RIGHT TO RESCIND PLAINTIFF'S EMPLOYMENT CONTRACT?

We begin our analysis by stating the rules of law governing the issuance of mandamus. To obtain a writ of mandamus, "the plaintiff must have a clear legal right to the performance of the specific duty sought to be compelled and the defendants must have a clear legal duty to perform the same." *State Bd of Ed v Houghton Lake Community Schools,* 430 Mich 658, 666; 425 NW2d 80 (1988). In addition, the plaintiff must be without an adequate legal remedy. *Cyrus v Calhoun Co Sheriff,* 85 Mich App 397, 399; 271 NW2d 249 (1978). A trial court's decision to grant a writ of mandamus will not be reversed absent an abuse of discretion. The trial court's findings of fact underlying the granting of the writ will not be disturbed unless clearly erroneous. *Michigan Waste Systems, Inc v Dep't of Natural Resources,* 157 Mich App 746, 760; 403 NW2d 608 (1987), lv den 428 Mich 900 (1987).

Defendants argue that plaintiff's otherwise existing right to a tenure hearing was abrogated because, under common law, defendants had the right to rescind plaintiff's contract upon learning that plaintiff had lied during his preemployment interviews. In support of this position defendants rely primarily on *Morgan v American University,* 534 A2d 323 (DC App, 1987).

In *Morgan,* the plaintiff applied for a "tenure-track" faculty position with American University but failed to disclose that he already held a position at another university. Upon discovering this fact, American University rescinded the plaintiff's contract without complying with the contractual notice and hearing procedures set forth in the faculty manual. *Id.,* p 324. The *Morgan* court held that the common-law right to rescission was not abrogated by the notice and hearing provisions in the plaintiff's contract. Therefore, the university could rescind the plaintiff's contract. *Id.,* pp 330-331.

*Morgan* is distinguishable in two material respects. First, in *Morgan* the plaintiff conceded that, in his preemployment interview, he did not inform the university that he was employed at another school. In the instant case, plaintiff denied that he ever admitted to his accusers that, while employed at the University of Toronto, he had sexual relations with numerous former patients. Thus, unlike in *Morgan,* in the instant case a dispute exists as to the underlying facts relied upon by defendants to justify an exercise of the common-law right of rescission.

Second, *Morgan* involved a private university, whereas the instant case involves a public university. This distinction is crucial. Procedural due process guarantees apply only in the presence of a "property" or "liberty" interest within the meaning of the Fifth or Fourteenth Amendment. *Williams v Hofley Mfg Co,* 430 Mich 603, 610; 424 NW2d 278 (1988), reh den 431 Mich 1202 (1988), app dis 489 US 1001; 109 S Ct 1102; 103 L Ed 2d 168 (1989). Any right to continued employment enjoyed by an employee of a private employer arises out of the employment contract. Such contractual rights do not rise to the level of a pro-

tected property interest. *Morgan,* 534 A2d 331; See also *Matulewicz v Governor,* 174 Mich App 295, 304; 435 NW2d 785 (1989), lv den 434 Mich 866 (1990). However, a public employee enjoys a property right in continued employment which the state may only take away in accordance with due process. *Michigan State Employees Ass'n v Dep't of Mental Health,* 421 Mich 152, 160-161; 365 NW2d 93 (1984). This includes tenured professors employed by a public university. *Bd of Regents of State Colleges v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972). Therefore, plaintiff, as a public employee and tenured professor, enjoyed a greater right to continued employment than did the privately employed plaintiff in *Morgan.*

Having distinguished *Morgan,* we find the United States Supreme Court's decision in *Cleveland Bd of Ed v Loudermill,* 470 US 532; 105 S Ct 1487; 84 L Ed 2d 494 (1985), dispositive.

In *Loudermill,* the plaintiff, a public employee, was terminated from his position as a security guard after the school board discovered he had falsely stated on his employment application that he had not been convicted of a felony. He received no pretermination hearing. However, a posttermination hearing was held. *Id.,* p 535. The Supreme Court held that some kind of pretermination hearing was required to comply with due process. *Id.,* pp 542-548.

The board of education's argument that Loudermill had no property right because he obtained his employment by lying was rejected in a footnote early on in the opinion:

> The Cleveland Board of Education now asserts that Loudermill had no property right under state law because he obtained his employment by lying on the application. It argues that had Loudermill

answered truthfully he would not have been hired. He therefore lacked a "legitimate claim of entitlement" to the position.

For several reasons, we must reject this submission. First, it was not raised below. Second, it makes factual assumptions—that Loudermill lied, and that he would not have been hired had he not done so—that are inconsistent with the allegations of the complaint and inappropriate at this stage of the litigation, which has not proceeded past the initial pleadings stage. *Finally, the argument relies on a retrospective fiction inconsistent with the undisputed fact that Loudermill was hired and did hold the security guard job. The Board cannot escape its constitutional obligations by rephrasing the basis for termination as a reason why Loudermill should not have been hired in the first place.* [470 US 539, n 5. Citation omitted.]

Accordingly, we conclude that plaintiff in the instant case, like Loudermill, had constitutional property rights which could only be terminated by procedures that met due process. Defendants' reliance on the rescission doctrine is a "retrospective fiction" that cannot be interposed to justify a deprivation of property without due process. Therefore, plaintiff had a clear right to be returned to his employment and to be terminated only in conformity with defendants' policy on dismissal of tenured faculty for cause. Defendants had a concomitant duty to perform the same.

II

DID THE PRETERMINATION PROCEDURE FOLLOWED IN THE INSTANT CASE AFFORD PLAINTIFF DUE PROCESS?

Defendants next argue that even if they were required to afford plaintiff due process, they were not necessarily required to afford plaintiff the due process set forth in that portion of the faculty

handbook entitled "Dismissal of Tenured Faculty for Cause." According to defendants, the nearly three-hour meeting between Provost Scott and plaintiff and his attorney satisfied the due process required by *Loudermill.* We disagree.

In support of their claim, defendants cite the following language from *Loudermill:*

> The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this *prior to termination,* would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee. [470 US 546. Citations omitted.]

The flaw in defendants' claim is the conclusion that, in so ruling, the Court in *Loudermill* held no posttermination hearing need be provided. The *Loudermill* decision clearly provides that the minimal pretermination procedure which it outlined is not alone adequate to satisfy due process. The Court noted that it had formerly stated that " '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the *nature of the subsequent proceedings.*' " *Loudermill,* 470 US 545, quoting *Boddie v Connecticut,* 401 US 371, 378; 91 S Ct 780; 28 L Ed 2d 113 (1971). The Court stated that the pretermination hearing "need not definitively resolve the propriety of the discharge. It should be an *initial check* against mistaken decisions . . . ." 470 US 545. The Court also said that its decision "rests in part on the provisions in Ohio law for a full post-termination hearing." 470 US 546.

Further, subsequent federal decisions affirm that a posttermination hearing is required if the public

employer elects to grant only a *Loudermill*-type pretermination hearing. See, e.g., *Crocker v Fluvanna Co Bd of Public Welfare,* 859 F2d 14, 16-17 (CA 4, 1988); *Gillard v Norris,* 857 F2d 1095, 1099 (CA 6, 1988).

Because plaintiff was provided no posttermination process, plaintiff was denied, without due process, his property right to continued employment, contrary to defendants' claim.

### III

### WAS MANDAMUS IMPROPERLY ISSUED BECAUSE IT WAS BASED ON DISPUTED FACTS?

Defendants argue that mandamus is precluded because a factual dispute exists as to whether plaintiff lied in his preemployment interviews and whether he subsequently admitted to Weston and Williams that he had sexual relations with several former patients while employed at Toronto.

Defendants are correct that mandamus may not be issued where disputed facts exist. *Lepofsky v Lincoln Park,* 48 Mich App 347; 210 NW2d 517 (1973). However, to place the trial court's actions in proper perspective we need to distinguish between issuing mandamus "based on disputed facts" and issuing mandamus where some of the facts are disputed. The trial court's decision in the instant case was based on the latter and not the former. The court's decision was based on the facts that plaintiff was hired as a tenured faculty member and was discharged in noncompliance with the established procedures applicable to the termination of tenured faculty. These facts were undisputed. They were also the only facts relevant to a determination whether mandamus should issue, given our resolution of defendants' first issue, *supra.* Whether plaintiff lied in his preemployment

interviews or pretermination interviews and hearing may be relevant in any tenure termination hearing, should the university initiate any such proceeding, but it was neither relevant to nor the basis of the trial court's decision to issue the writ.

IV

WAS THE ISSUANCE OF MANDAMUS PRECLUDED
BECAUSE PLAINTIFF HAD OTHER ADEQUATE LEGAL
AND EQUITABLE REMEDIES?

Defendants also argue that mandamus wrongly issued because plaintiff's claims were based on contract rights and plaintiff had other adequate legal and equitable remedies available.

Where the right or duty sought to be enforced rests *wholly* on contract, mandamus cannot issue to enforce it, because legal and equitable remedies afford relief. See *Clark v Peninsular Building & Loan Ass'n,* 268 Mich 584; 256 NW 556 (1934).

Plaintiff's claim rests on more than his contract with the university. It also rests on defendant university's declared policy that tenured faculty may only be dismissed following a full adversarial hearing at which the accused may cross-examine his accusers and bring in witnesses in his own defense.

Further, as noted earlier in this opinion, plaintiff's right is more than contractual; as a tenured professor at a public university, plaintiff's right to continued employment is a property interest safeguarded by due process. *Roth,* 408 US 576-577. See also *Matulewicz,* 174 Mich App 304. While mandamus does not lie to enforce a mere contract right, under appropriate circumstances, such as those arising in the instant case, it does lie to enforce a property right.

Moreover, we are unpersuaded that, given the circumstances of this case, alternate legal remedies available to plaintiff, such as injunctive relief, would be truly adequate. At the show cause hearing, plaintiff testified that his career would be severely damaged if his termination were permitted to stand while he pursued a final determination of the matter. Additionally, temporary loss of a constitutional right constitutes irreparable harm which cannot be adequately remedied by an action at law. *Chicago Teachers Union v Hudson,* 475 US 292; 106 S Ct 1066; 89 L Ed 2d 232 (1986).

Plaintiff's situation is clearly distinguishable from the situation in *Oakland Co Bd of Rd Comm'rs v State Highway Comm,* 79 Mich App 505; 261 NW2d 329 (1977), lv den 402 Mich 907 (1978), a case relied upon by defendants. There, neither a person's reputation nor a constitutional interest were involved.

Accordingly, we conclude that the trial court did not abuse its discretion in issuing the writ.

V

SHOULD THE COURTS DEFER, ON PUBLIC POLICY
GROUNDS, TO THOSE RESPONSIBLE FOR ACADEMIC
ADMINISTRATION?

Lastly, defendants advance a public policy argument that courts should defer to those responsible for academic administration, particularly where, under Const 1963, art 8, § 5, the educational unit is an autonomous constitutional authority. Support for this argument appears in *Parate v Isibor,* 868 F2d 821, 826 (CA 6, 1989), where the court stated:

Academic freedom thrives not only on the robust and uninhibited exchange of ideas between the individual professor and his students, but also on

the "autonomous decisionmaking [of] . . . the academy itself." [Quoting *Regents of the University of Michigan v Ewing*, 474 US 214, 226, n 12; 106 S Ct 507; 88 L Ed 2d 523 (1985).]

We have no quarrel with the general principle that academic freedom thrives on the uninhibited exchange of ideas between a professor and his students, but we do quarrel with the conclusion that, in the instant case, the autonomous decisionmaking of the university itself would promote academic freedom. After all, it was the autonomous decision of the university to hire plaintiff with tenure. In our opinion academic freedom is better promoted by holding the university to that position, rather than affording defendant university the convenience of common-law rescission, thus avoiding the possible embarrassment to the university stemming from its initial autonomous decision.

The university raises the following hypothetical case of the danger created if an educational institution is not permitted to rescind an employment contract with tenure guarantees obtained by misrepresentation. If the university were to learn that professor X, a tenured surgeon, had falsely presented that he had attended medical school, when he actually had not, untold harm would flow if professor X's contract could not be immediately rescinded without the delay of waiting for a faculty committee to hold a tenure termination hearing. We disagree.

The hypothetical danger posed is exaggerated. Paragraph II(b) of defendant university's policy on dismissal of tenured faculty for cause reads in pertinent part:

The faculty member may be relieved from any

or all academic duties during the proceedings at the discretion of the president, if recommended by the provost.

For all of the foregoing reasons, we affirm the decision and order of the Ingham Circuit Court. However, our decision does not, and should not, imply that plaintiff may not be discharged and his contract cancelled. Our decision means only that plaintiff may not be discharged and his contract cancelled unless cause for dismissal is established at a full due process hearing provided in accordance with the university's policy for dismissal of tenured faculty for cause.

Affirmed. No costs, a question of public importance being involved.