*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOSEPH NICHOLS,

        Plaintiff-Appellant,

and

MATTHEW HEMELBERG

        Plaintiff,

v

CITY OF FRASER and CITY OF FRASER CITY
COUNCIL,

        Defendants-Appellees.

UNPUBLISHED
January 15, 2019

No. 341699
Macomb Circuit Court
LC No. 2017-000053-AS

Before: LETICA, P.J., and CAVANAGH and METER, JJ.

PER CURIAM.

Plaintiff-appellant, Joseph Nichols, appeals by right an order denying his motion for a writ of superintending control arising from his removal as the city of Fraser's mayor by the city council following a hearing to consider allegations of sexual harassment made by city employees.[1] We affirm.

In November 2015 Nichols was elected to a four-year term as mayor of Fraser. Matthew Hemelberg was on Fraser's city council and also served as acting mayor. On January 3, 2017, D. Wayne O'Neal was appointed interim city manager for the city of Fraser. After the city council meeting held on that date, O'Neal purportedly observed both Nichols and Hemelberg engage in

---

[1] Plaintiff Matthew Hemelberg, who was a city council member and served as acting mayor, was also removed from office by the city council following this hearing. He was a party to the circuit court action, but has not appealed the decision.

sexually harassing behavior. Specifically, O'Neal saw Nichols give the then-finance director and city treasurer, Mary Jaganjac, a bear hug and kiss on her lips, and he saw Hemelberg massage the shoulders of the director of the library, Lorena McDowell. Subsequently, O'Neal conducted an investigation which included meeting with both of these women and they told him that the behaviors of Nichols and Hemelberg made them feel uncomfortable. Thereafter, in May 2017, Thomas Fleury, an attorney who specialized in employment and labor relations law, was retained to conduct an independent investigation.

On June 8, 2017, Fleury advised O'Neal that his 16-page report pertaining to this investigation was complete. The lengthy report summarized his interviews with several city employees, and attached to it were O'Neal's notes, as well as letters written by Jaganjac and McDowell detailing their experiences. In the interview with O'Neal, O'Neal detailed his initial observations and follow-up conversations with Jaganjac and McDowell. Fleury interviewed Jaganjac who, in brief, stated that Nichols' unprofessional behavior began almost immediately after she started working for the city. He hugged her often and, over time, the hugs got more offensive. He would also kiss her cheek at times. Nichols would look at her in a sexual way, and made sexually-oriented statements such as that he liked watching her leave. He would also spend an inordinate amount of time in Jaganjac's office which made her so uncomfortable that she would close her office door so that he would think she was not there and, at other times, she would leave when he arrived. After she asked Nichols to stop hugging her, his demeanor toward her completely changed. He spoke to her in a condescending and degrading manner, and also tried to embarrass her at council meetings.

Fleury also interviewed Leah Brown, a 25-year old clerk in the building department and someone to whom Nichols and Hemelberg would have no professional reason to seek out. Nevertheless, they did. And their conversations were oftentimes "totally unprofessional and of a sexual nature." They would discuss photos on their cell phones of "half naked ladies" and Nichols looked at her in a sexual manner. He commented that she looked good in leggings, unlike a woman he saw at an event who was wearing leggings and her "camel toe was in my face." Another time when she was shopping at Meijer's, Brown heard Nichols yell out to her, "Hey pretty baby," and he later joked about it when she saw him at work. Hemelberg also leered at her in a sexual manner and one time when she bent over for something, he commented saying, "Nice view over there." Another time Hemelberg came up behind her while she was sitting at her desk and he started to rub her shoulders.

Michele Kwiatkowski, the systems administrator who had worked for the city for 24 years, was also interviewed by Fleury. She told Fleury that there were rumors regarding Jaganjac and Nichols because of his outward displays of affection toward her. She and O'Neal observed Nichols give Jaganjac a bear hug and kiss on her lips in January 2017 after a city council meeting. Kwiatkowski asked Jaganjac if she was okay and Jaganjac responded, "No, I need to get out of here. The mayor won't leave me alone." Jaganjac indicated that Nichols would "corner her" and she would have to leave the office to dodge him. Kwiatkowski said that they had all observed Nichols' behavior. Kwiatkowski also told Fleury that she had spoken to Brown about Nichols and Hemelberg. Brown admitted that they bothered her and that she did not want to be alone with them. Hemelberg would sit at a desk near to Brown and just stare at her for long periods of time. Because Brown was scared to be alone with either of them, Brown

would text message Kwiatkowski whenever either of them came into the office so that Kwiatkowski could protect her.

Fleury also interviewed Kelly Dolland, the city clerk. She had heard Nichols and Hemelberg engaged in conversations with another office worker named Jennifer and they would use vulgar sexual terms like "tits," "ass," "boobs," and "screw." She had heard them say things like, "I'd like to bag that one," "I'd like to screw that one," and that they would like to "f--k Jamie." Dollard said that Nichols and Hemelberg were bullies and would retaliate when they became aware of the sexual harassment investigation. They liked to "play mind games" and intimidate people whenever they could. After a council meeting at which a female resident had said something Nichols did not agree with, Dollard heard Nichols tell the resident—in front of numerous witnesses—that "the night before, he had her mom's mouth on his balls."

Lorena McDowell, the director of the library, was also interviewed by Fleury and she was extremely nervous and hesitant to talk because she needed city council support for the library programs. She understood that the law prohibited retaliation for participating in a sexual harassment investigation, but she did not believe the law would protect her in reality. In any case, she realized this investigation was necessary. Overall, she believed Nichols' behavior was "creepy" in the way he gave people hugs and by the things he said. Both Nichols and Hemelberg had treated her in a sexual manner that was offensive and unacceptable. For instance, the first time Nichols met her he appeared to be surprised by her looks and actually looked her up and down. When she offered her hand for a hand shake, he took it in both of his hands and brought it up to his face. As he was walking away, she heard him tell the person he was with something to the effect of how she was good looking. Another time, she was pumping gas at a gas station and heard her name being called out. Nichols then drove up to her, got out of his truck, and gave her a close hug that was too close and too long, causing her to feel very uncomfortable. He then made statements about being supportive of the library and that he was going to support a millage which could result in her becoming a full-time director with a substantial pay raise. McDowell believed that he was "coming on to her" and implying that if she got along and did what he wanted, she and the library would benefit. She told the previous city manager about this incident, as well as her husband. McDowell also told Fleury about Hemelberg coming up behind her after a council meeting in January 2017 and rubbing her shoulders. He was so close that she could feel his upper body on her back. She did not welcome this behavior and she felt very uncomfortable.

Fleury's report indicated that both Nichols and Hemelberg declined to appear for an interview and had retained counsel.

Fleury's report included his findings following his investigation. He concluded that the witnesses were credible. They had no ulterior motive for participating in this investigation. To the contrary, they all feared retaliation and harsh treatment because of their participation but felt the behavior had to be stopped. Fleury concluded that both Nichols and Hemelberg engaged in verbal and physical conduct of a sexual nature. The behavior was pervasive, occurring on numerous occasions to different employees, and was totally unwelcome by the employees. This behavior substantially interfered with the employees' employment and created an intimidating, hostile, or offensive environment. For instance, Jaganjac had to actually leave to avoid contact, and Brown would text Kwiatkowski for protection whenever they appeared. While there was no

-3-

direct evidence that Nichols and Hemelberg sought sexual favors, employees were left with the impression that if they did not respond favorably to the verbal and physical sexual conduct, they would suffer some type of retaliation in the terms and conditions of their employment. Their behavior "was totally inappropriate and unacceptable in the workplace, and diminished the professionalism of employees of the City." In light of his findings, Fleury recommended that the city council take prompt remedial action. Fleury noted that the potential for retaliation, particularly by Nichols, was extremely high considering that they were high-ranking officials with substantial authority and that, after Jaganjac complained to Nichols, he became negative and abusive towards her. Fleury noted that it was up to city council to remediate the situation as set forth in the Fraser City Charter and rules adopted by the city, which he had not interpreted for purposes of his report.

At a subsequent city council meeting, a motion passed to hold a hearing in conformity with Section 5.2 of the Fraser City Charter regarding the removal of both Nichols and Hemelberg for misconduct in office as set forth in MCL 168.327 for sexual harassment. Thereafter, attorney Robert Huth, Jr. was retained to serve as special counsel to assist the city council as the presiding tribunal over the hearing. Attorney Huth sent a letter to Nichols and Hemelberg advising them that a hearing on the allegations of sexual harassment against them would be held on September 18, 2017, at the city hall. They could be represented by counsel, and could cross-examine witnesses, call witnesses, testify on their own behalf, and present any other evidence appropriate to respond to the charges.

In response to a letter requesting clarification that was sent on behalf of Nichols and Hemelberg by their attorney, Angela Mannarino, Huth sent another letter that stated: "Pursuant to the investigation conducted by Mr. Fleury, the Council voted to hold a hearing to investigate, take testimony, and determine whether Mayor Nichols' and/or Acting Mayor Hemelberg's actions, including, but not limited to alleged sexual harassment and other acts of harassment, intimidation and/or retaliation as described in the investigative report, constitute 'misconduct in office' as described in Section 5.2 of the City of Fraser Charter." Huth acknowledged that such misconduct must be related to the performance of their duties as officers and not simply their characters as private persons, and accordingly, "the hearing is the proper forum for the City Council to determine the validity or invalidity of these allegations as applied against this standard." Huth also stated that the city had an obligation to fully investigate such allegations to avoid liability under state and federal laws.

Subsequently, Nichols and Hemelberg sought a preliminary injunction to enjoin the removal hearing, which was denied by the Macomb Circuit Court.

On September 18, 2017, the Fraser City Council conducted the special tribunal hearing. All seven of the council members were present, including Nichols and Hemelberg. Retired Macomb Circuit Court Judge Peter J. Maceroni presided over the hearing at the request of city council. His role was to conduct the order of the hearing and respond to issues as well as objections. Before the hearing proceeded, Huth provided the city council with a memorandum of law which was also provided to opposing counsel, Mannarino. Then Huth conducted voir dire of the five voting council members and each stated that they would not make a decision on the matters until they had heard all of the testimony. During voir dire conducted by Mannarino, three council members admitted that they had previously expressed negative opinions about this

matter. But when asked by Judge Maceroni whether they agreed with the statement that they all had to have an open mind, they had to listen to the witnesses, and then make their decision, all of the council members responded in the affirmative.

Before providing testimony, each witness was sworn in by Judge Maceroni. Fleury was the first witness. He had practiced law for about 45 years and specialized in employment and labor relations. He conducted an investigation in this matter at the request of O'Neal. City employees were interviewed alone by him and then he prepared his report which was provided to the city council. Mannarino objected to city council having and considering the report, but Judge Maceroni overruled the objection because city council already had the report and had relied on that report in deciding to have the hearing. Fleury testified that the witnesses he interviewed were extremely credible. He concluded that they were credible because: they had no ulterior motives, they were even reluctant to be interviewed, they were concerned about their safety and their employment, they were afraid of retaliation, their sentiment and emotion came across very strongly, they were clear and concise, they did not contradict themselves, and they were emotional at times. Following his investigation, Fleury concluded that Nichols and Hemelberg engaged in unwelcome verbal and physical conduct of a sexual nature and the misconduct substantially interfered with the employees' employment by creating an intimidating, hostile, and offensive environment. He believed the conduct rose to the level that warranted removal from their public offices.

The second witness was O'Neal, the Fraser City Manager. He had worked in municipal government since 1975. After a leading question was asked by Huth, Mannarino objected but the objection was overruled on the ground that the Michigan Rules of Evidence did not govern the proceeding. O'Neal testified that he was at a city council meeting in January 2017 when he observed Hemelberg massaging the shoulders of the librarian and the massage appeared to be unwanted. O'Neal also saw Nichols embracing and kissing the face of the then-finance director and city treasurer, Jaganjac. Later O'Neal spoke to both women and they confirmed that the conduct was unwelcome and they were uncomfortable with that conduct. Mannarino objected to O'Neal offering hearsay testimony, but the objection was overruled on the ground that the rules of evidence did not govern the hearing. O'Neal believed that he had a legal obligation to take prompt action through an independent investigation and Fleury was recommended.

The third witness to be sworn in was Leah Brown. She had worked for the city for three years and worked in the building department. In her job there was no reason for her to have any contact with Nichols or Hemelberg, but she did have contact with them from time to time. She recalled one incident when she was wearing leggings and Nichols commented that, while not everyone could, she could wear leggings. He went on to say that he was recently at an event and women who were wearing leggings "had their camel toes in my face." This sexual conversation was "completely unwanted." Another time she was working with her supervisor when Nichols and Hemelberg began discussing their weekend. They showed some photos of half-dressed women who they claimed wanted their pictures taken with them. Another council member was present at that time, Yvette Foster. On cross-examination, Brown testified that she did not make a complaint about this offensive conduct because they held positions of power and she felt uncomfortable, nervous, and intimidated.

The fourth witness was Michele Kwiatowski. She had worked for the city for about 24 years and was the systems administrator. Her husband also worked for the city as a DPW worker and one day in 2016 he was sent by his supervisor to do some hot patch work in the parking lot of a business located in Roseville that was owned by Hemelberg's father. After a citizen made a complaint, Kwiatowski's husband got written up so he wrote a letter to the city council explaining what happened. From that time on she had problems at work, including questioning by Hemelberg and Nichols as to how her position was created, how she got her job, challenging her qualifications and such. There had been over 200 documented contacts from them but, before the hot patch incident, she had three contacts with Nichols and Hemelberg.

Kwiatowski was asked if she had observed behavior by Nichols or Hemelberg that she thought was inappropriate as related to the sexual harassment charges and she responded that many times when they were in the building, Brown would text her and ask her to come over to get her away from her cubicle or to keep her company. One day at the beginning of the year Kwiatowski had noticed that Brown was almost in tears when they had left and she seemed very nervous. Brown told her some of the things they were doing and that they made her very nervous. Kwiatowski told Brown that she would be happy to stay with her if she was not comfortable being alone with them. Kwiatowski also witnessed Nichols giving Jaganjac a bear hug and kiss in January 2017. She had spoken with Jaganjac about numerous incidents. Jaganjac was very uncomfortable with Nichols and she would hide in her office. One time Jaganjac was invited to Nichols' house to go swimming and Kwiatowski asked Jaganjac if there was something going on with them because Nichols seemed very friendly toward Jaganjac between the hugs and always being in her office. Jaganjac said that she kept asking Nichols to stop and he would not stop and said he did not care. But as soon as Jaganjac told Nichols to leave her alone, his demeanor toward her changed; she went from being the perfect finance director "to just absolutely could do nothing right." Jaganjac eventually quit and got a job with the city of Sterling Heights.

On cross-examination, Kwiatowski testified that she did not tell Brown to go to the previous city manager (who was not O'Neal) because he had told Kwiatowski that there was nothing he could do about the harassment she had been experiencing after the hot patch incident. He told her that Nichols was a bully and that she should get an attorney if she wanted the harassment to stop.

The fifth witness was Kelly Dolland, the city clerk. She heard a number of conversations and comments made by Nichols and Hemelberg. She heard them use vulgar, sexual terms and make statements like "I'd like to bag that one." She also heard them make lewd references to female body parts. Judge Maceroni ruled that because Fleury's report contained the more specific and detailed information and the city council had that report, no further reference need be made at the hearing. Dolland stated that the report was accurate.

Dollard was the last witness presented by Huth. Mannarino then called council member Yvette Foster as a witness. Foster testified that she did not witness the event that Brown testified Foster witnessed. And she did not recall either Nichols or Hemelberg making any comments of a sexual nature when they were in the building department. On cross-examination, Huth clarified that Foster had no memory of seeing inappropriate pictures on a phone.

-6-

Thereafter, Huth's closing statement consisted of advising the city council that they must vote on motions to remove either or both Nichols and Hemelberg, or to just receive and file the information that they received at the hearing. In closing, Mannarino advised the city council that two of the witnesses against her clients did not come and present testimony; thus, neither Nichols nor Hemelberg should be removed from office. Following deliberations, the city council voted to remove both Nichols and Hemelberg under Section 5.2 of the Fraser City Charter for official misconduct.

Nichols and Hemelberg then filed a motion in the circuit court seeking a writ of superintending control following their removal from office allegedly in violation of the city charter. Nichols and Hemelberg identified ten "fatal errors," including: (1) city council removed them without sufficient evidence of official misconduct; (2) three council members admitted during voir dire that they were biased against them; (3) they were forbidden from voting on the motions to remove them; (4) they were denied the ability to cross-examine witnesses; (5) city council was not informed of the standard under which they were to make a decision; (6) the witness testimony was unreliable and not credible; (7) there was no evidence presented at the hearing that they created a hostile work environment; (8) the conclusions in Fleury's report were blatantly erroneous; (9) none of the accusers had previously objected to their alleged actions; and (10) city council never put forth formal charges against them. Accordingly, Nichols and Hemelberg requested the circuit court to enter an order requiring the city council to reinstate them to their official positions.

On October 30, 2017, the city and city council responded to the motion for a writ of superintending control, arguing that to warrant the issuance of such a writ it must be established that the city council had a clear legal duty to take a particular ministerial action and that no other remedy might achieve the same result. Here, Nichols and Hemelberg claimed that ten "fatal errors" occurred related to their removals from office but a superintending control action is not a substantive appeal on the merits; rather, it is a mechanism whereby a court can compel an inferior tribunal to perform a clear legal duty. Questions of fact may not be reviewed or determined by the court and, likewise, the weight of the evidence may not be considered. Only errors of law may be considered. And, the city argued, conducting a tribunal hearing was the council's only clear legal duty—which was satisfied—prior to their voting on the removal of Nichols and Hemelberg from office. That is, the provisions set forth in Section 5.2 of the city charter were completely satisfied; thus, Nichols and Hemelberg failed to allege or establish that the city council had a clear legal duty it failed to perform. Accordingly, this matter should be dismissed with prejudice. Moreover, it is a long-standing policy of this state that the courts will not interfere with a city council's decision on the removal of an elected official pursuant to a city charter. Simply stated, superintending control does not provide an avenue to collaterally attack the outcome of a removal hearing, although it might be used to compel such a hearing.

On December 7, 2017, following oral arguments, the circuit court issued its 23-page opinion and order denying the motion for a writ of superintending control under MCR 3.302. First, the court rejected the claim that three council members were biased against them because the record showed that the council members agreed to have an open mind and would make their decision based on the evidence presented at the hearing. Second, the court rejected the claim that the council failed to give Nichols and Hemelberg notice of the charges against them because the letter sent to their counsel plainly referenced the sexual harassment allegations. Third, the court

rejected the claims that Fleury's report contained blatantly false conclusions because counsel for Nichols and Hemelberg had the opportunity to cross-exam Fleury at the hearing and it was up to the city council to determine his credibility and to weigh the evidence. Further, the court noted that Judge Maceroni had ruled that the Michigan Rules of Evidence did not apply and, although counsel for Nichols and Hemelberg raised hearsay objections, counsel "failed to request clarification as to why the rules of evidence did not apply or to cite a court rule, case law, or Charter provision requiring their application." Accordingly, it was not reasonable to argue that reinstatement was required because the rules of evidence were not followed.

Fourth, the court rejected the claim that there was "absolutely no evidence that they created a hostile work environment." Considering Fleury's report and the testimonies of Fleury, O'Neal, Brown, Kwiatkowski, and Dolland—which the court detailed at length—the court concluded that all of the women involved were members of a protected class; the hugs, kisses, shoulder massages, comments about appearance, and other inappropriate statements and/or conduct were all due to the women's sex; that the sexual conduct and communication were not welcome; and that said conduct/communication was pervasive and was intended to, or did in fact, substantially interfere with the women's employment or created an intimidating, hostile, or offensive work environment.

Fifth, the court rejected the argument that "none of the accusers objected to the alleged conduct until O'Neal intervened." For example, McDowell did complain to the previous city manager. The court also noted: "To the extent that Nichols and Hemelberg claimed that O'Neal encouraged the women at issue to fabricate accusations, the evidence does not support such a position." The evidence also showed that the women were afraid of retaliation and, in fact, after Jaganjac told Nichols to stop hugging her, his demeanor toward her changed at city council meetings.

Sixth, the court rejected the claim that Nichols and Hemelberg were removed from office without sufficient evidence of official misconduct, i.e., conduct that affects the performance of official duties. The conduct complained of here was not social in nature and mostly occurred in city offices and during council meetings when Nichols and Hemelberg were acting in an official capacity. Even when Nichols approached McDowell at a gas station he discussed library business and implied that if she cooperated with him, she would get a raise. Further, their conduct was detrimental to the flow of city business because employees were focused on avoiding them rather than performing their job duties.

Seventh, the court rejected the claim that the city council was not instructed as to the standard by which to make their decision. This was not a jury trial so "jury instructions" were not required. Further, the council members had decided to hold the hearing based on the information contained in Fleury's report; thus, they were well aware of the issues they would be considering and voting upon. Eighth, the court rejected the claim that the testimony presented at the hearing was unreliable and not credible because it was for the council members to make those determinations and to weigh the evidence. Ninth, the court rejected the claim that Nichols and Hemelberg were denied the opportunity to cross-exam the witnesses because Mannarino cross-examined all of the witnesses presented at the hearing and even presented the direct witness testimony of council member Foster. Tenth, the court rejected the claim that Nichols and Hemelberg were improperly denied the right to vote on their removals from office. Section

5.2 of the Fraser City Charter provided that a majority vote of council was required for removal "exclusive of any member whose removal is being considered." Because the removal of both Nichols and Hemelberg was being considered, neither could vote at the hearing.

In summary, the circuit court concluded that "Nichols and Hemelberg did not meet their burden of demonstrating that the Council failed to perform a clear legal duty, which is to reinstate them to their respective elected offices." Thus, their motion for a writ of superintending control was denied pursuant to MCR 3.302. Accordingly, the case was dismissed and closed. This appeal followed.

Nichols argues that the circuit court erred when it held that he "did not meet his burden of establishing that the Fraser City Council failed to perform a clear legal duty when it failed to comply with the city charter." We disagree.

A court's decision on a request for superintending control is reviewed for an abuse of discretion. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 259 Mich App 315, 346; 675 NW2d 271 (2003). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010).

> The writ of superintending control supersedes the writs of certiorari, mandamus, and prohibition, and provides one simplified procedure for reviewing or supervising a lower court or tribunal's actions. MCR 3.302(C). The filing of a complaint for superintending control is not an appeal, but, rather, is an original civil action designed to order a lower court to perform a legal duty. Superintending control is an extraordinary power that the court may invoke only when the plaintiff has no legal remedy and demonstrates that the court has failed to perform a clear legal duty. Therefore, if a plaintiff has a legal remedy by way of appeal, the court may not exercise superintending control and must dismiss the complaint. [*Shepherd Montessori Ctr Milan*, 259 Mich App at 346-347 (internal citations omitted).]

In this case, the circuit court did not abuse its discretion in denying the motion for a writ of superintending control because Nichols failed to establish that the city council had a clear legal duty to reinstate him as the mayor of the city of Fraser.

The city of Fraser is a municipal corporation with a home rule charter which provides that the city council constitutes the legislative and governing body of the city. The city council is expressly authorized by the city charter to remove an officer from elected office. Section 5.2 of the Fraser City Charter addresses the removal of an officer, and provides in relevant part:

> Removals of officers by the Council shall be made for either of the following reasons: (1) for any reason specified by statute for removal of city officers by the governor [MCL 168.327], (2) for misconduct in office under the provisions of this charter. Such removals by the Council shall be made only after hearing of which such officer has been given notice by the Clerk at least ten days in advance, either personally or by delivering the same at his last known place of residence. Such notice shall include a copy of the charges against such officer. The hearing shall

afford an opportunity to the officer, in person or by attorney, to be heard in his defense, to cross-examine witnesses and to present testimony. If such officer shall neglect to appear at such hearing and answer such charges, his failure to do so may be deemed cause for his removal. A majority vote of the members of the Council in office at the time, exclusive of any member whose removal is being considered, shall be required for any such removal.

Clearly the city charter mandates that removal of an officer shall be for cause only. That is, under MCL 168.327 the governor may remove an elected officer for specified causes, such as when there is sufficient evidence of official misconduct, wilful neglect of duty, and other misdeeds. Likewise, the charter permits removal for "misconduct in office." Thus, the cause stated for removal "must have direct relation to and be connected with the performance of official duties . . . ." *Wilson v Council of City of Highland Park*, 284 Mich 96, 98; 278 NW 778 (1938). The *Wilson* Court further explained:

> The misconduct which will warrant the removal of an officer must be such as affects his performance of his duties as an officer and not such only as affects his character as a private individual. In such cases, it is necessary to separate the character of the man from the character of the office. The misconduct charged and established must be something which plaintiff did, or did not do, in his official capacity. [*Id.*]

In this case, the stated cause or "charge" against Nichols was the sexual harassment of city employees in his official capacity as the mayor of the city. This charge arose following an investigation of allegations of sexual harassment by city employees in the course of their employment. This charge, if established, would be a sufficient and relevant reason for removal from office for cause. And Nichols has neither argued nor provided any law to the contrary.

Next, we consider the proceedings required for removal of a public officer. According to the Fraser City Charter, removal of an officer cannot occur unless notice of the charge and of the hearing is provided at least ten days before the hearing. Then, at the hearing, the officer must be afforded the opportunity, in person or by attorney, "to be heard in his defense, to cross-examine witnesses and to present testimony." In other words, the hearing is quasi-judicial[2] in nature and must be fair. A city council is authorized to exercise legislative and administrative functions, and the administrative function may include quasi-judicial powers. *Bonner v City of Brighton*, 495 Mich 209, 240 n 71; 848 NW2d 380 (2014). As our Supreme Court recognized long ago:

---

[2] "Quasi-judicial" is: "A term applied to the action, discretion, etc., of public administrative officers, who are required to investigate facts, or ascertain the existence of facts, and draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature." *Pletz v Secretary of State*, 125 Mich App 335, 351-352; 336 NW2d 789 (1983), quoting *Black's Law Dictionary* (4th ed), p 1411 (1968); see also *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83, 91-92; 803 NW2d 674 (2011).

The members of council are not judicial officers and when acting as a removing board that body is not a court in any strict sense nor bound by all the rules and technicalities recognized and enforced in regularly constituted courts; but when proceeding to hear and determine, in the exercise of the limited power to remove for cause an elective officer, the hearing is judicial in its nature, the body necessarily acts in a *quasi* judicial capacity, and the procedure must be of a *quasi* judicial character. [*Hawkins v Common Council of City of Grand Rapids*, 192 Mich 276, 288; 158 NW 953 (1916).]

Therefore, the presiding city council members must be able to act in a fair and impartial manner, "without prejudice, personal interest, or ill feelings towards the accused, in a frame of mind ready and willing to hear, weigh, and judicially pass upon the evidence produced, and in the end determine the case upon its merits as disclosed upon the hearing." *Id*. at 289. And after all of the evidence has been presented to the city council, a majority vote of its members is required for the officer's removal; however, as set forth in the city charter, council members whose removal is at issue cannot cast a vote.

Following a removal decision, judicial review is generally limited and arises from the supervisory authority of a court over lower tribunals. See MCR 3.302(A); *Shepherd Montessori*, 259 Mich App at 346. That is, a complaint for superintending control may be filed to determine whether the inferior tribunal, i.e., the city council, exceeded its jurisdiction and acted according to the law. See *Dep't of Pub Health v Rivergate Manor*, 452 Mich 495, 500; 550 NW2d 515 (1996) (citations omitted); *In re Credit Acceptance Corp*, 273 Mich App 594, 598; 733 NW2d 65 (2007). The petitioner must establish that the inferior tribunal failed to perform a clear legal duty and that the petitioner is otherwise without an adequate legal remedy, including that an appeal is unavailable. MCR 3.302(B), (D)(2); *In re Credit Acceptance*, 273 Mich App at 598; *In re Gosnell*, 234 Mich App 326, 341; 594 NW2d 90 (1999).

Because the city council's act of removing an elected official for cause is primarily an administrative proceeding, an appeal challenging the substantive merits of the removal decision is not available. See, e.g., *Appeal of Fredericks*, 285 Mich 262, 265-266; 280 NW 464 (1938); *Lepofsky v City of Lincoln Park*, 48 Mich App 347, 359-360; 210 NW2d 517 (1973). By complaint for superintending control, review of the removal decision is limited to questions of law and may not include the weighing of evidence or credibility determinations. See *People v Burton*, 429 Mich 133, 139; 413 NW2d 413 (1987); *Czuprynski v Bay Circuit Judge*, 166 Mich App 118, 121-122; 420 NW2d 141 (1988) (citations omitted). However, the court must determine, as a question of law, whether the record of the adjudicative hearing contained substantial evidence to support the removal decision. *In re Payne*, 444 Mich 679, 690; 514 NW2d 121 (1994). As the *Payne* Court explained:

'Substantial evidence' has a classic definition: the amount of evidence that a reasonable mind would accept as sufficient to support a conclusion. While it consists of more than a scintilla of evidence, it may be substantially less than preponderance. [*Id*. at 692.]

In this case, Nichols argues that the city council had a clear legal duty to reinstate him as mayor of the city of Fraser; thus, the circuit court abused its discretion in denying his motion for

a writ of superintending control. Nichols identifies the same ten "fatal errors" that he relied on in the circuit court, which were rejected. We likewise reject these allegations of fatal error, and mostly for the same reasons the circuit court rejected each claim of error.

First, Nichols claims that "the conclusions contained in Fleury's report are blatantly erroneous." As the circuit court noted, Nichols' attorney had the opportunity to cross-exam Fleury without limitation at the hearing with regard to his investigation and his conclusions. It was then up to the city council to weigh the evidence and determine whether Fleury was a reliable investigator and credible witness. Second, Nichols claims that "city council never put forth formal charges against Nichols and Hemelberg."[3] As the circuit court noted, letters were sent to both Nichols and his counsel that specifically set forth the charges of misconduct in office based on allegations of sexual harassment by city employees. And as a member of city council, Nichols was provided with Fleury's lengthy investigative report that included the names of the persons interviewed, as well as the allegations made during the interviews.

Third, Nichols claims that "three council members admitted during the illusory voir dire that they were biased against Nichols and Hemelberg." It is true that city council members presiding over a removal hearing must be able to act in a fair and impartial manner. See *Hawkins*, 192 Mich at 289. During Huth's voir dire of the council members, he asked if they would wait until they heard all of the testimony before they made a decision as to how to vote on motions to "receive and file" or to remove either or both Nichols and Hemelberg. The five voting council members were individually queried by Huth and responded in the affirmative. Mannarino then began her voir dire, particularly of three council members who, after reviewing Fleury's investigative report, had sought the resignations of Nichols and Hemelberg and/or were in favor of holding the removal hearing. After Mannarino's voir dire, Judge Maceroni asked the council members whether they would have an open mind and listen to the witnesses before making their decision and they all responded in the affirmative. The fact that council members had pursued the removal of Nichols after the investigation was conducted does not automatically render them disqualified from participating in the hearing and determination of this matter. See *id*. And Nichols has presented no support for his claim that the council members did not act fairly and impartially in the determination of this matter.

Fourth, Nichols claims that he "and Hemelberg were denied the opportunity to cross-examine witnesses." As the circuit court noted, Nichols' attorney did cross-examine the witnesses presented at the hearing. Further, under Section 5.2 of the Fraser City Charter, Nichols was permitted "to be heard in his defense" and "to present testimony." Although he argues that the city failed to call some of the witnesses that were named in Fleury's investigative report, Nichols fails to present any legal authority in support of the proposition that the city was required to present those specific witnesses. Further, Nichols does not claim that he was prevented from calling those witnesses and does not explain why he did not call those witnesses to testify. To the extent that Nichols is arguing that hearsay testimony was improperly admitted at the hearing,

---

[3] Because Hemelberg is not a party to this appeal, it is unclear why he is referenced here and throughout Nichols' appeal brief; thus, such claims will be disregarded.

he has failed to present any legal authority in support of such argument on appeal. Further, as the circuit court noted, Judge Maceroni ruled during the hearing that the Michigan Rules of Evidence did not apply and Mannarino neither sought an explanation nor provided any legal authority to show that they should apply to the hearing.

Fifth, Nichols claims that "none of the accusers objected to the alleged actions of Nichols until O'Neal intervened." We are unclear as how this claim, even if true, supports Nichols' argument that city council had a clear legal duty to reinstate him as the mayor of the city of Fraser. As the circuit court noted, if Nichols is implying that O'Neal encouraged the accusers to fabricate allegations against him, there is no evidence to support such a claim. There is evidence, however, that the accusers were in fear of retaliation if they complained about his conduct and that retaliation included further harassment and losing their jobs considering Nichols' high-ranking position as mayor and his well-known reputation as a "bully."

Sixth, Nichols claims that "the testimony presented at the hearing was unreliable and was not credible." In his brief on appeal, Nichols only refers to the testimony of one witness presented against Nichols. However, it was for the city council which presided over the removal hearing to decide issues of fact by weighing the evidence and making credibility determinations; neither the circuit court nor this court may substitute judgment or interfere with those findings. See *Burton*, 429 Mich at 139; *Czuprynski*, 166 Mich App at 121-122.

Seventh, Nichols claims that "there was absolutely no evidence presented that Nichols created a hostile work environment." Pursuant to MCL 37.2103:

(i) Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:

(*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment . . . .

(*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment . . . .

(*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment . . . .

As our Supreme Court noted in *Chambers v Trettco, Inc*, 463 Mich 297, 310; 614 NW2d 910 (2000), sexual harassment that falls into either subsection (*i*) or (*ii*) is commonly referred to as quid pro quo harassment and sexual harassment that fall into subsection (*iii*) is referred to as hostile environment harassment. The elements of hostile environment harassment are: "(1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of sex; (3) the employee was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or

offensive work environment; and (5) respondeat superior." *Id*. at 311, quoting *Radtke v Everett*, 442 Mich 368, 382-383; 501 NW2d 155 (1993).

On appeal, Nichols argues that "Brown pointed to three isolated incidents during her over two years of employment that she allegedly found objectionable (despite the fact that she never actually objected)." Nichols claims that Brown's testimony was not credible and did not establish hostile environment harassment. However, the city council possessed Fleury's investigative report—which was admitted as evidence during the removal hearing—that detailed at length the conduct that gave rise to the charges of sexual harassment against Nichols, as discussed above. Further, Fleury testified at the removal hearing regarding his investigation and the sexual harassment allegations, as detailed above. O'Neal, the city manager, testified at the removal hearing regarding his direct observations, as well as his investigation of the possible sexual harassment of city employees by Nichols and Hemelberg, as detailed above. And city employees Brown, Kwiatowski, and Dolland also testified as to their experiences and observations, as detailed above. We agree with the circuit court's discussion of the evidence and its well-reasoned conclusions, which we need not repeat here. In summary, contrary to Nichols' argument, "a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with [the women's] employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Radtke*, 442 Mich at 394.

Eighth, Nichols claims that "the city council was not informed of the standard under which they were to make a decision." However, it is clear from the record that before the removal hearing began Huth provided the city council and opposing counsel with a memorandum of law. As Huth argues on appeal, that memorandum contained the applicable ordinances and standard for misconduct in office as set forth in *Wilson*, 284 Mich at 98. Nichols does not dispute that the city council and his attorney were provided with this memorandum of law. Further, we agree with the circuit court that a form of jury-type instructions were not required or warranted. The city council had a copy of Fleury's lengthy and informative investigative report, as well as the memorandum of law; thus, Nichols' claim that city council had insufficient information to reach a proper conclusion is without merit.

Ninth, Nichols claims that "Hemelberg was forbidden from voting on the motion for Nichols' removal." However, this was a joint hearing where the removal of both Hemelberg and Nichols was being considered and decided. Section 5.2 of the Fraser City Charter specifically states that "[a] majority vote of the members of the Council in office at the time, exclusive of any member whose removal is being considered, shall be required for any such removal." Nichols, as the mayor, and Hemelberg were members of the city council. We agree with the circuit court that, according to the plain and broad terms of the city charter, both Nichols and Hemelberg were prohibited from voting on motions related to either of their removals following the joint hearing.

Tenth, Nichols claims that "city council removed Nichols without sufficient evidence of official misconduct." As discussed above, the city charter mandates that removal of an officer shall be for cause only. In this case, the cause for removal was misconduct in office; specifically, Nichols' sexual harassment of city employees in his official capacity as the mayor. See *Wilson*, 284 Mich at 98. Because we concluded above that there was sufficient evidence for the city council to find that Nichols' unwelcome sexual conduct and communication created a

hostile work environment, it follows that the record of the hearing contained substantial evidence to support the removal decision. See *In re Payne*, 444 Mich at 690. In other words, the city council members could conclude from the evidence that the charge of misconduct in office was sufficiently established, warranting a vote to remove Nichols from office.

In summary, the circuit court did not abuse its discretion in denying Nichols' motion for a writ of superintending control because he failed to establish that the city council had a clear legal duty to reinstate him as the mayor of the city of Fraser.

Affirmed.


/s/ Anica Letica
/s/ Mark J. Cavanagh
/s/ Patrick M. Meter